IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

M.O., a minor, by her parents and next friends,
Elizabeth Seymour and Robert Ourlian
4534 Burlington Place, N.W.,
Washington, D.C. 20016,

and

ELIZABETH SEYMOUR AND ROBERT OURLIAN
4534 Burlington Place, N.W.,
Washington, D.C. 20016,

      Plaintiffs,

v.

DISTRICT OF COLUMBIA,
A Municipal Corporation
One Judiciary Square,
441 Fourth Street, N.W.,
Washington, D.C. 20001,

      Defendant.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Preliminary Statement**

1. This is an action brought by Elizabeth Seymour and Robert Ourlian ("the parents" or "Ourlians"), in their own right and on behalf of their daughter, M.O., alleging that the District of Columbia Public Schools ("DCPS") failed to provide M.O. with the free appropriate public education ("FAPE") to which she is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 *et seq.* However, this case is about more than a basic failure of a local school system to appropriately educate a disabled student. The Hearing Officer who decided this action compounded the IDEA violation when he failed to render a fair

or complete decision. Specifically, the Hearing Officer literally ignored significant evidence in the record, failed to reference in any way the faulty schedule given by DCPS to the parents, failed to rule on the school system's blatant disregard of M.O.'s documentation of the extent of her disability, and summarily dismissed the deleterious effects of a one-to-one aide on M.O.'s independence and continued development. All of these issues were before the Hearing Officer, but ignored.

2. The Hearing Officer erred in issuing a Decision that concluded that the Individualized Education Program ("IEP") offered by DCPS in November of 2010 for the 2010-2011 school year constituted a FAPE that could be implemented at the proposed school placement. The Hearing Officer similarly erred in determining that the parents were not entitled to receive tuition reimbursement for the 2010-2011 school year.

## Jurisdiction

3. This Court has jurisdiction pursuant to the IDEA, 20 U.S.C. §§ 1400 *et seq.* and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Plaintiffs have exhausted their administrative remedies and seek to reverse the decision of a Hearing Officer of the Student Hearing Office of the Office of the State Superintendent of Education, 2011-0349 (July 7, 2011).

## Parties

4. M.O. is an eight-year-old disabled student, eligible to receive special education and related services, who at all times relevant to this action resided in the District of Columbia. Her parents, Elizabeth Seymour and Robert Ourlian, bring this action on M.O.'s behalf and in their own right.

5.  The District of Columbia is a municipal corporation receiving federal funds under the IDEA. 20 U.S.C. §§ 1400 *et seq.* DCPS is a local educational agency as defined by 20 U.S.C. § 1401 that is part of the District of Columbia, and, as such, receives financial assistance from the United States Department of Education. DCPS is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in the District of Columbia.

## Factual Allegations

6.  M.O. is an eight-year-old student who recently completed her first year at The Lab School of Washington ("Lab").

7.  M.O. has been diagnosed with a learning disability, not otherwise specified, Attention Deficit Hyperactivity Disorder ("ADHD"), Dyspraxia Syndrome, and Hypotonicity.

8.  DCPS has found M.O. eligible to receive services under the IDEA as a child with a Specific Learning Disability.

9.  M.O. attended the Maddux School ("Maddux"), a private school in Maryland, during the 2009-2010 school year.

10.  M.O.'s teachers at Maddux were trained and/or experienced in special education; they noticed that she had difficulty with the acquisition of new vocabulary, marked processing problems in understanding verbal directions and stories read to her, and significant difficulty expressing or explaining complex ideas or thoughts.

11.  Dr. Paula Elitov completed a psycho-educational evaluation of M.O. in the Fall of 2009 that revealed M.O. has a learning disability and ADHD, causing weaknesses in language

processing, verbal memory, language comprehension, reading comprehension, math reasoning, and written expression.

12. Dr. Elitov's evaluation stressed the need for M.O. to be in a small group for educational instruction in order to receive frequent feedback, verbal cuing, tasks analysis, and support for attention.

13. M.O.'s teachers at Maddux continued to report difficulty focusing her attention in class and keeping her on pace to complete activities, even in the small classes at Maddux. As the year wore on, M.O.'s teachers expressed their belief that her disabilities were so significant that she required a full-time special education school.

14. On July 13, 2010, the parents enrolled M.O. as a non-attending student in DCPS to begin the process of obtaining special education services for her.

15. The parents sent an enrollment packet to DCPS that contained detailed reports from Maddux explaining M.O.'s present levels of performance and the reasons for her referral to DCPS.

16. The parents first requested an eligibility evaluation and IEP meeting for M.O. on July 13, 2010.

17. Through counsel, the parents sent a follow up letter to DCPS on July 15, 2010 stating that they would consider what the school system would offer, but that M.O. would not be attending her home school of Janney Elementary School ("Janney") unless the services were appropriate.

18. Despite the parents' earlier request, no IEP meeting was held during the Summer of 2010.

19. The parents enrolled M.O. at Lab, and she began school there in August of 2010.

20. Lab is a nonpublic, special education school located in Washington, D.C. that specializes in educating students with disabilities like M.O. Lab holds a Certificate of Approval from the Office of the State Superintendent of Education, and DCPS regularly funds students at the school.

21. On August 18, 2010, DCPS sent a letter to the parents containing analysis of the parents' independent evaluations, a Prior Written Notice of Evaluation, and a Multi-Disciplinary Team Meeting invitation for September 21, 2010.

22. The parents sent a letter on September 3, 2010, through counsel, agreeing to allow DCPS to observe M.O. at Lab.

23. DCPS school psychologist Debborah Lahre-Joyner observed M.O. at Lab on September 14, 2010.

24. Ms. Lahre-Joyner concluded that M.O. has significant deficits in language processing, memory, fine motor skills, visual spacial skills, sensorimotor processing, and executive functioning. Within her academic skills profile, M.O.'s spelling and reading fluency scores were particular weaknesses. Ms. Lahre-Joyner recommended that M.O. receive specialized instruction in all academic areas, as well as modifications and accommodations.

25. An IEP meeting was held with DCPS on September 21, 2010.

26. At the IEP meeting, DCPS agreed to include staff from Lab at the next meeting and to consider M.O.'s updated academic scores from Lab.

27. On October 5, 2010, Lab completed an IEP for M.O.

28.     Lab's staff stressed that M.O. could not function effectively in a general education environment and called for her to receive services in the areas of perceptual readiness, oral language, written language, reading, math, social behavioral, and speech and language.

29.     The parents forwarded a copy of Lab's IEP to DCPS on October 15, 2010.

30.     An IEP meeting was held with DCPS on November 1, 2010.

31.     DCPS found M.O. eligible to receive special education services as a student with a specific learning disability, with primary impact in math and secondary impact in reading comprehension, written language, and speech/language.

32.     The IEP team met again on November 17, 2010.

33.     At the November 17, 2010 meeting, DCPS proposed an IEP containing services in math, reading, written expression, speech and language, social behavioral, and motor skills.

34.     Janney could not and cannot implement a full-time special education IEP.

35.     The DCPS IEP offered twenty hours a week of special education, half of which would be provided in a general education setting, and three hours a week of related services in the areas of Occupational Therapy, speech and language pathology, and behavioral support.

36.     DCPS proposed Janney as the placement to implement its IEP.

37.     DCPS rejected the parents' request for a full-time special education placement consistent with Lab's recommendations and those of Dr. Elitov.

38.     During the IEP meeting, the parents objected to the IEP service hours, the inclusion of a general education environment, and the Janney placement proposal.

39. The DCPS Special Education Coordinator responded to the parents' concerns by stating that a full-time aide could be offered when M.O. would be in the general education environment.

40. The Special Education Coordinator's response, after the DCPS IEP had already been proposed, was the first time the school system had ever mentioned or offered a dedicated full-time aide.

41. DCPS then added consideration of a dedicated aide to the IEP.

42. M.O.'s evaluations and reports from Maddux already indicated an over-reliance and troublesome dependence on adult support, and that a full-time aide would be inappropriate.

43. The parents expressed their concern at the IEP meeting that a full-time aide would only exacerbate M.O.'s considerable dependence on adult support.

44. DCPS ignored the parents' concerns about a full-time aide.

45. The parents rejected the school system's proposed IEP at the meeting and expressed their intention of seeking public funding for Lab.

46. The parents, through counsel, sent a follow up letter to DCPS on November 23, 2010, memorializing their rejection of the proposed IEP.

47. The parents and Amy Mounce, the parents' educational expert, visited and observed Janney on December 13, 2010.

48. The parents and Ms. Mounce were given a second grade class schedule by Janney staff that, upon examination, could not meet M.O.'s needs or effectively implement the proposed IEP.

49.     Ms. Mounce issued a report on March 1, 2011 detailing the findings of her observation at Janney and comparisons between Janney and Lab.

50.     Ms. Mounce concluded in her report that M.O. requires a structured environment with deliberate instruction and assistance. Moreover, Ms. Mounce noted that while Janney does have speech/language therapy, it lacks the necessary integrated support that is found at Lab.

51.     Ms. Mounce found Janney to be inappropriate and Lab to be an appropriate placement for M.O.

52.     The parents filed a due process hearing request on April 1, 2011 appealing the decision of the IEP team.

53.     The hearing request contained the following issues:

- Did DCPS deny M.O. a FAPE by failing to develop an appropriate IEP for the 2010-2011 school year;

- Did DCPS deny M.O. a FAPE by failing to propose a proper placement; and

- Is The Lab School of Washington a proper placement for M.O.

54.     The due process hearing was held on June 20, 23, and 27, 2011.

55.     The parents presented evidence and testimony that established that M.O. requires full-time, self-contained special education and related services.

56.     The parents also established that Janney was an inappropriate placement for M.O. because it could not implement her IEP and because it did not have the fully self-contained classes that M.O. requires.

8

57. Specifically, the parents presented testimony that DCPS had given a proposed class schedule to the parents and Ms. Mounce upon their visit to Janney in December of 2010. Ms. Mounce testified that this schedule was inappropriate for M.O. and could not implement her IEP.

58. During the hearing, DCPS witnesses admitted for the first time that they had not read the detailed enrollment reports sent to them nearly a year prior to the hearing that explained the extent of M.O.'s disabilities and prior educational interventions.

59. The parents submitted a written closing argument that, *inter alia*, reiterated for the Hearing Officer how DCPS violated federal and District of Columbia law when it ignored the wealth of information in M.O.'s enrollment packet.

60. The Hearing Officer issued his Hearing Officer Decision ("the decision") on July 7, 2011.

61. The Hearing Officer denied all requested relief, finding that the parents failed to meet their burden on all issues before him.

62. The Hearing Officer made significant legal errors, factual misstatements, and omissions in the Decision.

63. Despite hearing significant testimony, reviewing exhibits, and receiving argument on the issue, the Hearing Officer failed to mention in any way the faulty schedule given to the parents.

64. The Hearing Officer committed substantial legal error by refusing to rule on the parents' argument that DCPS failed to consider critical documentation of M.O.'s educational level and instructional needs. The Hearing Officer incorrectly justified his refusal to consider

this information by finding that the parents' argument was not presented in their complaint. However, the parents were unaware of the school system's violation until the hearing itself and thus raised the issue at the first possible time.

65. The Hearing Officer inexplicably ignored virtually all of plaintiffs' witness testimony.

66. The Hearing Officer dismissed the parents' expert testimony regarding the inappropriateness of Janney, but did not explain why or credit any school system witnesses as justification.

67. The Hearing Officer committed a significant factual error by finding that the first time the issue of a dedicated one-to-one aide was mentioned was in Ms. Mounce's March 2011 report.

68. The Hearing Officer dismissed the parents' expert testimony concerning the harmfulness of a one-to-one aide without explanation or credit to any school system witness as justification.

69. The Hearing Officer erroneously substituted his own notions of how to educate M.O. over those of parents' experts, based on nothing in the record before him.

70. The Hearing Officer's findings of fact were not regularly made.

71. The Hearing Officer applied incorrect legal standards in reaching his decision.

72. The parents are aggrieved by the Hearing Officer's decision.

73. The plaintiffs have exhausted their administrative remedies.

## COUNT I

(Failure to Provide a FAPE)

74. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 73.

75. Defendant's failure to provide M.O. with a free appropriate public education violates plaintiffs' rights under the IDEA and District of Columbia law.

## COUNT II

(Failure to Order an Appropriate Program and Placement)

76. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 75.

77. The failure of the Hearing Officer to order defendant to place and fund M.O. in an appropriate program violates the IDEA and District of Columbia law.

## COUNT III

(Failure of the Hearing Officer to Render a Proper Decision)

78. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 77.

79. The Hearing Officer committed error and violated plaintiffs' due process rights under the IDEA and District of Columbia law by failing to render a proper decision based on an accurate and impartial understanding of the facts.

80. The Hearing Officer committed error and violated the plaintiffs' due process rights under the IDEA and District of Columbia law by failing to apply correct legal standards and follow controlling precedent.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1. Issue judgment for plaintiffs and against defendant;

2. Issue declaratory relief that defendant violated plaintiffs' rights under applicable law;

3. Issue injunctive relief, vacating the decision of the Hearing Officer and ordering defendant to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling M.O at The Lab School of Washington for the 2010-2011 school year;

4. Order defendant to place and fund M.O. at The Lab School of Washington for the 2011-2012 school year and declare it to be her current educational placement under the IDEA;

5. Order defendant to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6. Award any other relief that this Court deems just.

Respectfully Submitted,

*[signature]*

Michael J. Eig                #912733
Paula A. Rosenstock      #494580
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs